26 So.2d 558

### MOORER v. MALONE.
#### 1 Div. 240.

Supreme Court of Alabama.
June 13, 1946.

Wm. G. Caffey and Jack G. Gallalee, both of Mobile, for appellant.

Jere Austill and Robt. H. Smith, both of Mobile, for appellee.

STAKELY, Justice.

This suit involves a claim of adverse possession of wild land. On June 22, 1936, the land in question, aggregating about 160 acres and lying in Mobile County, was sold to the state for taxes assessed against Karekin G. Korian. Early Malone (appellee) purchased the land from the state and received a deed from the state on September 20, 1939. M. L. Moorer (appellant) claims title to the land under a deed from Karekin G. Korian executed on August 1, 1940, for a recited consideration of $100. Suit in statutory ejectment for the land was filed by M. L. Moorer against Early Malone on February 7, 1945. The case was tried before the court without the intervention of a jury and resulted in a judgment for the defendant. This appeal is from that judgment.

■ It is obvious that both parties claim title through a common source. It appears to be conceded that the tax deed to appellee is insufficient as a muniment of title because of defects in the procedure on which it is based. Accordingly its effect is limited to use as color of title. The result is that appellant's record title must prevail, unless appellee has shown three years adverse possession prior to the commencement of the suit, so as to bring the case within the influence of § 295, Title 51, Code of 1940. Tidwell v. McCluskey, 191 Ala. 38, 67 So. 673; Perry v. Marbury Lumber Co., 212 Ala. 542, 103 So. 580; Morris v. Mouchette, 240 Ala. 349, 199 So. 516; Long v. Boast, 153 Ala. 428, 44 So. 955. The pleadings in the case present this issue and a correct interpretation of the evidence on this issue will determine the result of the case.

■ The essential elements of adverse possession are: (1) the possession must be hostile and under claim of right; (2) it must be actual; (3) it must be open and notorious; (4) it must be exclusive, and (5) it must be continuous. Chastang v. Chastang, 141 Ala. 451, 37 So. 799, 109 Am. St.Rep. 45; Montgomery v. Spears, 218 Ala. 160, 117 So. 753. It may be added that, "To constitute an actual possession of land it is only necessary to put it to such use or exercise such dominion over it as in its present state it is reasonably adapted to." Alabama State Land Co. v. Matthews, 168 Ala. 200, 53 So. 174, 175.

It is not practicable to set out all the evidence, but substantially speaking it showed the following: At the time appellee received his deed from the state the land was wild land. It contained a fair growth of pine trees, suitable for turpentine operations and for saw logs, and a fair growth of young pines. The land had never been under cultivation. Before purchasing the property, appellee had it surveyed and the lines marked by blazing, so as to know what he would receive, if he purchased. After receiving his deed, appellee assessed the land for taxation in November, 1939, and paid the taxes thereon. He has assessed the land for taxes and paid the taxes thereon each year since that time.

A public road ran through the land at about the center of the land and shortly after he received his deed, appellee posted about three dozen signs along the lines of the land and along both sides of the public road, which read "Keep Off, E. O. Malone."

■ Shortly after obtaining his deed appellee leased the land to his brother, Ollie Malone, to be worked for turpentine. Ollie Malone hung 2,240 metal cups and aprons on the trees on the land and chipped one streak in February, 1940, and about April, 1940, began chipping a new streak each two weeks and a little later on in the summer began chipping one streak each week. This continued until the end of the turpentine season in the fall of 1940, when turpentine ceased to flow. The fact that the trees were being worked for turpentine was plainly visible from the public road. This was effective notice of the occupancy of the land at that time. Bedsole v. Davis, 189 Ala. 325, 66 So. 491.

After obtaining his deed in August, 1940, appellant comes into the picture. He took T. T. Taylor, who had run the lines for appellee, out to the land and the two drove over the land. They both testified that all the timber had been boxed for turpentine with about 4,000 boxes. Appellant was informed that appellee was working the timber, but made no attempt to take possession of the land.

■ Chipping and working the trees for turpentine was resumed at the beginning of the turpentine season in 1941, by Ollie Malone—this seasonal operation on the land did not break the continuity of possession.—McMillan v. Aiken, 205 Ala. 35, 88 So. 135; Windsor Realty Co. v. Finnegan, 210 Ala. 314, 97 So. 822—and continued until about midsummer, when, because of labor trouble, he ceased to work the trees for turpentine.

Shortly thereafter in the summer of 1941, appellee had the merchantable timber, about 18,000 or 20,000 feet, cut and sold it to Ollie Malone who operated a saw mill a few miles away. This cutting and hauling consumed 30 days or more. There is a discrepancy in the evidence as to when the cutting and hauling of timber ceased, but

under the aspect of the evidence most favorable to appellee, the cutting and hauling was finished in October, 1941. The tops of the trees were cut off and these with the freshly cut stumps were left on the land in plain view of the public road. In cutting down the trees, some of the signs that had been placed thereon were cut down, but appellee nailed other signs along the road.

After the logs had been removed, according to appellee, appellee watched the land "very much" to protect a "fair growth of young timber" and extinguished one fire on the property.

On January 1, 1942, appellee and his wife and children, with some other help, began clearing a site for a home. This work of clearing continued from that date to the time of trial. Appellee worked whenever he could and not less than once each week: "There was quite a bit of brush there and a lot of grubbing to be done and stumps to be took out and burnt out and there was quite a bit to do." The site for the home was about the middle of the land and the work of clearing was plainly visible from the public road.

Appellee drilled a well about February, 1942, and for that purpose erected a tripod which was visible from the road and when the well had been drilled, a pump was installed. In May, 1942, appellee erected a garage on the land and in June or July, 1942, he began the construction of a home on the land and just before its completion, appellee and his family moved into the house and have since occupied it as a home, so that at the time of trial, forty-five acres were fenced, of which thirty-five acres were in cultivation. At a cost of about $7,000 appellee converted this wild land into a home for himself with such conveniences as running water, butane gas, a large barn, a slaughter house with concrete floor, chicken house, etc.

During this time appellant took no action except to tell appellee that he had a deed to the land, at which time appellee replied that he had a deed from the state, and asked to see appellant's deed. Appellant replied that his lawyer had the deed and he would get it and see him later. This conversation took place late in 1940, or under one aspect of the evidence after the timber was cut in 1941.

The lower court found from the evidence, "That defendant held adverse possession of the land sued for in the complaint for three years before this suit was brought," and we think there was evidence to sustain this finding. Appellant concedes that from May, 1942, when appellee began to build on the property, to the date of filing suit on February 7, 1945, there is evidence of possession of such character that it would have ripened into title if continued for the statutory period. Appellant earnestly insists, however, that the acts relied on to show continuous adverse possession prior to May, 1942, are wholly insufficient for that purpose.

Beyond a question adverse possession began with the turpentine operations in February, 1940, and continued through the timber operations in the late summer or early fall of 1941. Authorities supra. From that time on we do not consider that the evidence shows an abandonment of possession, but rather, if anything, a mere interruption of actual occupation, considering the nature of the land and the use which its possession might then permit. Aldrich Mining Co. v. Pearce, 192 Ala. 195, 68 So. 900; Gary v. Woodham, 103 Ala. 421, 15 So. 840; McMillan v. Aiken, 205 Ala. 35, 88 So. 135.

But omitting consideration of what had gone before, beginning in January, 1942, Early Malone and his family began the actual clearing of the site on which to build their home. They dug stumps, cut down brush, piled it up and burned it. This was an essential part of the plan to establish a home on the wild land and when this was followed by drilling the well, with its tripod, and the erection of the garage, followed by all the other building, improvement and fencing activities which have been enumerated, we think there was ample evidence to sustain the judgment of the lower court.

Affirmed.

GARDNER, C. J., and FOSTER and LAWSON, JJ., concur.