105 So.2d 429

**Ellen Nix CLANAHAN et al.**

v.

**C. B. MORGAN et al.**

**2 Div. 377.**

Supreme Court of Alabama.

Sept. 11, 1958.

Thos. E. Skinner, Birmingham, and Laps-
ley & Berry, Selma, for appellants.

Adams, Gillmore & Adams, Grove Hill, and Grady W. Hurst, Jr., Chatom, for appellees.

LAWSON, Justice.

This is a suit in equity to establish title to 240 acres of land situate in Choctaw County, described as follows: "W ½ of NW ¼ of Section 1; and NE ¼ of Section 2; all in Township 10 North, Range 3 West."

The bill of complaint was filed in the Circuit Court of Choctaw County, in Equity, on April 15, 1950, by C. B. Morgan, Blanche Morgan, and approximately thirty others against Ellen Nix Clanahan and scores of other individual respondents and against the described 240 acres of land, pursuant to the provisions of what is known as the Grove Act, which authorizes a proceeding in rem to clear up title to land. Article 2, Chapter 32, Title 7, Code 1940, §§ 116–1132. See Act No. 882, approved September 12, 1951, Acts of Alabama 1950–51, p. 1521, which purports to amend certain sections of the original Grove Act.

C. B. Morgan and Blanche Morgan claim the title to the surface of the said 240-acre

tract of land, to which we will hereafter refer as the respondent land. They also claim a portion of the oil, gas and minerals. The other complainants, claiming through the same chain of title as the Morgans, claim various mineral interests in the respondent land. The alleged ownership and interest of each of the complainants is set out in the bill and each of them prays that his, her or its title or interest in the respondent land be ascertained and quieted. The bill also prays that the title to the suit property be quieted as against the numerous parties, known and unknown, who are alleged to claim some right, title or interest in the respondent land or a part thereof.

The only persons who actually contest the title of the complainants are the numerous heirs at law of one Daniel Nix, who died intestate in 1862, survived by his widow and six children, one of whom will be referred to hereafter as the second Daniel Nix. They will be referred to sometimes hereafter as the Nix heirs. Their claim of title to the respondent land as heirs of Daniel Nix was submitted to the trial court pursuant to "Amendment Number Eleven to Answer and Cross Bill as Last Amended Filed September 21, 1954."

All of the testimony was taken orally in the presence of the trial court except answers of the Nix heirs to interrogatories. Testimony was taken on several different occasions. On May 30, 1956, a final decree was entered. The trial court found that the complainants were entitled to relief, decreed that the Nix heirs had no title to the respondent land, and established the title thereto in the complainants. From that decree the Nix heirs appealed to this court. Submission here was on August 30, 1957.

Throughout the brief filed here on behalf of the appellants are statements to the effect that the trial court decided this case in favor of the complainants solely under the conclusive evidence rule as it appears in § 1123, Title 7, Code 1940. We cannot agree.

There is no express finding of facts as such in the decree, although there is a long prefatory statement consisting of forty separately numbered paragraphs, wherein the trial court did recite that for at least a period of twenty years immediately preceding the filing of the bill the taxes on the respondent land had been paid exclusively by the complainant, C. B. Morgan, and his predecessor, J. W. Rudder, and that the overwhelming preponderance of the evidence was to the effect that not a single one of the Nix heirs had had any actual possession of the respondent land or had asserted any claim of title thereto or had assessed or paid any taxes thereon within the period of thirty years prior to the time this suit was instituted. In Paragraph 38 of said prefatory statement the trial court said as follows:

"The evidence in this cause is very voluminous and presents a multitude of detailed acts of possession with respect to the respondent land for the last forty or fifty years, as far back in fact as the recollection of the witnesses, some of whom were in their eighties, could go. The possession of the complainants and the assessment and payment of taxes under the applicable statutes and the decisions of the Supreme Court of Alabama, sustains the title of the complainants as herein decreed."

This statement in our opinion does not indicate that the trial court decreed in favor of the complainants solely on the basis of the conclusive presumption rule of evidence under the original Grove Act. It seems to us that the statement just quoted can just as well be construed as showing that the trial court's decree was also based on other grounds upon which the complainants base their right to relief, that is, (a) prescription; (b) adverse possession of ten years; and (c) the short statute of limitations.

In the sixteen paragraphs of the decree which follow the prefatory statement there is no reference to either possession or taxes and there is absolutely no factual

situation referred to in the decree proper, that is, in the part of the decree where relief is granted to the complainants and denied to the respondents-cross complainants.

█ In any event, if the decree correctly determined the equities of the case, the reasons upon which the trial court acted are unimportant and the case will be affirmed. A correct decision will not be disturbed even if the court gave a wrong or insufficient reason therefor. Pitts v. Hawkins, 264 Ala. 428, 87 So.2d 835; Cherokee County v. Cunningham, 260 Ala. 1, 68 So.2d 507; Garrett v. Federal Land Bank, 239 Ala. 191, 194 So. 530.

█ The question presented here is whether or not there was legal evidence before the trial court sufficient to sustain its decree vesting all of the title to all of the respondent land in the complainants and decreeing that the Nix heirs have no interest therein. As we have shown, most of the testimony was taken orally before the trial court, hence our review is guided by the settled rule that the finding of the trial court, where testimony is taken orally before it, or partly so, has the effect of a jury verdict and will not be disturbed on appeal unless plainly and palpably wrong. Parrish v. Davis, 265 Ala. 522, 92 So.2d 897, and cases cited; Laney v. Dean, Ala., 100 So.2d 688, and cases cited.

We see no reason to encumber this opinion with the procedural history and the details of the background of this litigation, which in the trial court covered the period from April 15, 1950, to May 30, 1956, and which on two phases has already been before this court. Ex parte Arrington, 259 Ala. 243, 66 So.2d 96; Ex parte Clanahan, 261 Ala. 87, 72 So.2d 833, 50 A.L.R.2d 134.

On July 25, 1925, A. H. and A. P. Chesnut conveyed the respondent land to Dr. J. W. Rudder, reserving one half of the mineral interests. On January 25, 1946, Dr. Rudder conveyed the respondent land to C. B. and Blanche Morgan, reserving one half of his mineral ownership. Taxes for the year 1925 were assessed and paid by the Chesnuts. Dr. Rudder assessed and paid the taxes for the years 1926–1946. Subsequent to 1946, the taxes were assessed and paid by the Morgans.

The Chesnuts acquired a deed to the W ½ of NE ¼ of Section 2 from E., Sid, Leddie and Annie Abston on December 12, 1922, which land has been referred to as the Abston 80. They acquired a deed to the E ½ of NE ¼ of Section 2 from J. M. Hearin and wife on December 20, 1922. The property covered by that conveyance has been called the Hearin 80. The Chesnuts received a deed to the W ½ of NW ¼ of Section 1 from John T. Doggett and wife on January 4, 1923. This land is referred to as the Doggett 80.

The south half of the Abston 80 (W ½ of NE ¼ of Section 2) was granted by patent from the United States to one David Daniel on January 1, 1860. There is no conveyance of record from patentee. The north half of the Abston 80 was granted by patent from the United States to the Daniel Nix under whom the Nix heirs claim. This is the only part of the respondent land to which Daniel Nix or his wife Adeline had any paper title. The Abston 80 was purchased by the State for unpaid taxes assessed against "owner unknown." The State conveyed its interest therein to one S. T. Ulmer on April 24, 1896. S. T. Ulmer by quitclaim deed recorded on December 21, 1896, conveyed the said eighty acres of land to O. M. Nix, who was the daughter of the second Daniel Nix, who was a son of the first Daniel Nix under whom the Nix heirs claim. From 1896 to 1916 this 80 was assessed in the name of O. M. Nix except the year 1908 when the second Daniel Nix assessed it. On December 2, 1914, O. M. Nix and the second Daniel Nix executed a warranty deed conveying the W ½ of NE ¼ of Section 2 (the Abston 80) to A. and E. Abston. The heirs of A. Abston on February 10, 1922, conveyed to J. S. Abston (Sid) the north half of this 80. As we have shown above, Sid (J. S.) Abston and wife and E. Abston and wife conveyed this eighty acres of land by warranty deed to

A. P. and A. H. Chesnut on December 12, 1922.

The Hearin 80 (E ½ of NE ¼ of Section 2) was granted by patent from the United States to David Daniel on January 1, 1860. There is no record of any conveyance from the patentee or of the administration of his estate. His heirs are unknown. The Hearin 80 was purchased by the State for unpaid taxes assessed against "owner unknown." The State conveyed its interest therein to S. T. Ulmer on April 24, 1896. S. T. Ulmer by quitclaim deed recorded on December 21, 1896, conveyed the said eighty acres of land to O. M. Nix, the same person who acquired the deed to the Abston 80. On March 7, 1907, the second Daniel Nix, the father of O. M., executed a mortgage to Z. T. Harrison conveying the NE ¼ of the NE ¼ of Section 2, that is, the north half of the Hearin 80. On July 27, 1907, mortgage was executed by Z. T. Harrison to J. M. Hearin on the entire 80. As already shown, J. M. Hearin on December 20, 1922, executed warranty deed conveying the entire 80 to A. P. and A. H. Chesnut.

The Doggett 80 (W ½ of NW ¼ of Section 1) was granted by patent from the United States to David Daniel in 1862. There is no record of any conveyance out of the patentee or his heirs. The Doggett 80 was purchased by the State for unpaid taxes assessed against "owner unknown." The State conveyed its interest therein to Emma Nix on April 13, 1896, who afterwards married one Dansby. Emma Nix was a daughter of Littleberry Nix, who was a son of the first Daniel Nix. Littleberry Nix died intestate in 1904. On March 25, 1899, Emma Nix Dansby conveyed this 80 to C. R. Gavin who, on February 17, 1903, conveyed to R. M. Morris. On May 6, 1903, R. M. Morris received a warranty deed on this same 80 from the second Daniel Nix and wife. On September 25, 1907, Morris conveyed to Doggett who, as shown above, conveyed to A. P. and A. H. Chesnut on January 4, 1923.

The complainants do not contend that the tax deeds in their chain of paper title are valid. They do not claim under those deeds except as going to show color of title in the grantees named therein and those claiming under them. It is, of course, well settled that an invalid tax deed gives color of title and possession thereunder is adverse. Merchants Nat. Bank of Mobile v. Lott, 255 Ala. 133, 50 So.2d 406; Odom v. Averett, 248 Ala. 289, 27 So.2d 479.

It is established without dispute that not a single one of the Nix heirs assessed or paid any taxes on the respondent land or ever received any rent or income therefrom or ever performed any act of possession or ownership upon such land adverse to the complainants or to those under whom complainants claim title. Yet, in their initial pleading, the Nix heirs claimed the full and undivided fee simple title to all of the respondent land as the heirs of the first Daniel Nix, although the only record or paper title to any portion of the respondent land in him was the patent covering the north half of the Abston 80. As to the remainder of the respondent land, the Nix heirs advanced two theories. First: Daniel Nix, the first, and David Daniel were one and the same person whose true name was David Daniel Nix. Second: David Daniel granted to the first Daniel Nix before the latter died in 1862 the land described in the patent from the United States to David Daniel; and that the evidence of such grant was lost, mislaid, misplaced or destroyed before the same was filed for record or that the record thereof was destroyed in a fire that consumed the courthouse in Choctaw County in 1871. The Nix heirs subsequently abandoned their theory that Daniel Nix and David Daniel were one and the same person. In their cross bill, upon which the cause was submitted, the Nix heirs make substantially the same allegations with reference to a lost grant to the first Daniel Nix and go further and allege that the lost grant was made to him or to his wife, Adeline Nix. In that cross bill the Nix heirs conceded to the complainants an un-

divided one-sixth interest in the Doggett 80 and in the Abston 80. The concession as to the Doggett 80 is undoubtedly based on the fact that complainants trace their title back to the warranty deed executed by the second Daniel Nix to R. M. Morris on May 6, 1903. As to the Abston 80, the concession of the one-sixth interest is undoubtedly based on the fact that O. M. Nix and the second Daniel Nix conveyed this 80 to the Abstons on December 2, 1914.

█ We have very grave doubt as to whether there is anything in this record to support a presumption of a grant to the first Daniel Nix or his wife Adeline of that part of the respondent land to which David Daniel received a patent, and he received a patent to all but forty acres of the respondent land. However, for the purpose of this appeal, but for that purpose alone, we will assume that such was the case. That assumption will be of no avail to the Nix heirs, for in our opinion the record before us clearly supports a finding that the complainants have acquired title to all of the respondent land by adverse possession of ten years.

The evidence tends to show that practically all of the respondent land is what is sometimes referred to as "wild timbered land." There is no evidence of any complete enclosure of these lands by fences, or of any residences having been constructed thereon. There is some testimony going to show that more than forty years ago an unenclosed field was cultivated on the north half of the Abston 80 and that there has been a pasture on the south half of that 80 for more than fifty years.

As the Chesnuts acquired the Abston 80, the Hearin 80 and the Doggett 80, they had the lines around each 80 surveyed and blazed, and posted no trespassing signs, bearing the Chesnut name, on the outside boundaries of the tract.

There are tendencies of the evidence which amply support the following chronological summary of the facts of possession, beginning with the conveyance of all of the respondent land by the Chesnuts to Dr. J. W. Rudder in 1925.

"1925—Chesnut in possession; lines had been surveyed and blazed, posted in name of Chesnut, Chesnut assessed and paid taxes. Chesnut conveys to Rudder and surrenders possession to him. * * * Sykes put a mill on the land and started cutting timber for Rudder. * * *

"1926—The Chesnut signs remained up; the Sykes sawmill operation continued and the lines around the entire tract were run and blazed by Sykes and Dr. Rudder. * * * Rudder assessed and paid taxes.

"1927—The Sykes sawmill operation continued; the Chesnut signs remained posted; Dr. Rudder moved some of the rails from the pasture fence to repair the community fence along the south line of this tract; Rudder assessed and paid taxes. * * *

"1928—The Chesnut posting is still on the land, and all of the evidence of the Sykes sawmill operation, including the several mill sites, the foundation timbers, the slab pits, the sawdust piles, the corrals, the logging and tram roads remained visible on the land; Rudder assessed and paid taxes; Dr. Rudder issued a hunting permit on the respondent land to C. B. Morgan who went on the land and hunted under authority of this permit. * * *

"1929—The Chesnut posting is still on the land; the evidence of the Sykes sawmill operation is still visible on the land; Dr. Rudder assessed and paid the taxes; Dr. Rudder issued a hunting permit on the respondent land to C. B. Morgan who went on

the land and hunted under authority of this permit.

"1930—The Chesnut posting is still on the land; the evidence of the Sykes sawmill operation is still visible on the land; Dr. Rudder assessed and paid the taxes; Dr. Rudder issued a hunting permit on the respondent land to C. B. Morgan who went on the land and hunted under authority of this permit. * * *

"1931—The Chesnut posting is still on the land; the evidence of the Sykes sawmill operation is still visible on the land; Dr. Rudder assessed and paid the taxes; Dr. Rudder issued a hunting permit on the respondent land to C. B. Morgan who went on the land and hunted under authority of this permit. * * *

"1932—The Chesnut posting is still on the land; the evidence of the Sykes sawmill operation is still visible on the land; Dr. Rudder assessed and paid the taxes; Dr. Rudder issued a hunting permit on the respondent land to C. B. Morgan who went on the land and hunted under authority of this permit.

"1933—The Chesnut signs are still on the land and the evidence of the Sykes sawmill operation is still visible. J. W. Rudder, Jr., acting with the permission and under the authority of his father, Dr. Rudder, cut pulpwood and tie timber from this land, also some pine timber, and paid his father the stumpage; Dr. Rudder assessed and paid the taxes. * * *

"1934—The Chesnut signs are still on the land and the evidence of the Sykes sawmill operation is still visible. J. W. Rudder, Jr., acting with the permission and

under the authority of his father, Dr. Rudder, cut pulpwood and tie timber from this land, also some pine timber, and paid his father the stumpage; Dr. Rudder assessed and paid the taxes. * * *

"1935—There was no timber cutting in 1935 but the Chesnut signs were still on the land and the evidence of the Sykes sawmill operation also remained on the land; Dr. Rudder assessed and paid the taxes. * * *

"1936—There was no timber cutting in 1936 but the Chesnut signs were still on the land and the evidence of the Sykes sawmill operation also remained on the land; Dr. Rudder assessed and paid the taxes. * * *

"1937—There was no timber cutting in 1937 but the Chesnut signs were still on the land and the evidence of the Sykes sawmill operation remained on the land; Dr. Rudder assessed and paid the taxes. * * *

"1938—Rudder sold piling to Clark which was logged by C. B. Morgan; the outside boundary lines on the W ½ of NW ¼ of Section 1 were reblazed by C. B. Morgan and Odell Clark in connection with Clark's cutting the timber which he had purchased from Dr. Rudder; Chesnut signs were still on the land and the evidence of the Sykes sawmill operation remained on the land; Dr. Rudder assessed and paid the taxes. * * *

"1939—Odell Clark bought timber on the respondent land from Dr. Rudder and cut and removed it; Mozingo begins the cutting and removing of timber for Dr. Rudder, taking over the Odell

Clark operation, and cutting roads for the removal of this timber; the Chesnut signs remained on the land; the evidence of the Sykes sawmill operation was on the land; Dr. Rudder assessed and paid the taxes; Leonard Kemp cut and removed hickory from the respondent land, which he purchased from Dr. Rudder; Willie Sellers cut and removed cross-ties and paid stumpage to Dr. Rudder. * * *

"1940—In 1940 we have the same situation as 1939, the signs are up, the signs of the Sykes mill and the previous cutting are on the ground; Leonard Kemp is cutting and removing hickory and in 1940 Mozingo continues his timber cutting; and Willie Sellers continues the cutting and removing of cross-ties which he bought from Dr. Rudder; Dr. Rudder assessed and paid taxes. * * *

"1941—Mozingo continues his timber cutting operation; Sellers continues his tie operation; the Chesnut signs remain on the land; and the signs of the previous timber cutting, including the Sykes sawmill operation, remain visible on the ground. Dr. Rudder assessed and paid the taxes. * * *

"1942—The situation is identical with 1941. Dr. Rudder assessed and paid taxes. * * *

"1943—The situation continues the same as 1941 and 1942, with the same timber operation by Mozingo and the same tie operation by Sellers. Dr. Rudder assessed and paid taxes. * * *

"1944—The situation remains the same as 1941, 1942 and 1943, with

Mozingo continuing his timber operation and Sellers continuing his tie operation. Dr. Rudder assessed and paid taxes. * * *

"1945—The situation continues the same as it existed in 1941–1944, the Chesnut signs are still on the land, the signs of the Sykes sawmill operation are still visible, as well as previous cutting, Mozingo continues his timber operation, cutting and removing timber and making logging roads; Willie Sellers continues his tie operation, cutting and hewing the ties by hand, and leaving visible on the ground the chips and litter from the operation; Dr. Rudder assessed and paid taxes. * * *

"1946—Rudder sells to Morgan. Taxes were assessed in Dr. Rudder's name and paid by him. The Chesnut signs are still on the land, Morgan saw some of these signs after he purchased the land; the Willie Sellers tie operation continues down to the time that Rudder sold to Morgan. Grady Mosley cut some timber on the land for C. B. Morgan; he cut some 15,000 or 20,000 feet; the Placid Oil Company pipe line was constructed, the operation beginning in January 1946, with the permission of Morgan; Morgan immediately posted the land with no trespassing signs; Morgan *patroled* the land daily. * * *

"1947—The Morgan posting continues; the pipe line is on the land and in operation; the evidence of the prior timber cutting, including the sawmill operation, is still on the ground; timber which Morgan sold was cut and

removed; Morgan assessed and paid the taxes. * * *

"1948—The Morgan posting continues; the pipe line is on the land and in operation; the evidence of the prior timber cutting, including the sawmill operation, is still on the ground; Morgan assessed and paid the taxes. * * *

"1949—The property remains posted by Morgan; Morgan cut some timber; the pipe line remains on the ground and is in operation; Morgan re-fenced the Abston pasture, cut the bushes on it and began using it as a pasture; the evidence of the Sykes sawmill operation and previous timber cutting remains visible; Morgan assessed and paid the taxes. * * *

"1950—Morgan continues to use the pasture; Berry Downing bought some timber on the respondent land from C. B. Morgan and began cutting it about the middle of April 1950; the pipe line is still visible on the ground and in operation; the Morgan posting is up; signs of the sawmill operation and previous timber cutting are visible on the ground; and Howard Bankston, beginning in January, started cutting timber that he had bought from Morgan. * * *"

Against all of the continuous and visible activity from 1939 down to the filing of the bill in April, 1950, a period of more than ten years, the evidence shows not one overt act of possession or claim of ownership by any Nix to any of the respondent land subsequent to 1896 except the second Daniel Nix, and there is not one act of ownership or possession by him as to the Doggett 80 and the Hearin 80 since about 1907 and as to the Abston 80 since 1914.

The principles governing the acquisition of titles by adverse possession are well stated in Goodson v. Brothers, 111 Ala. 589, 595–596, 20 So. 443, 444, as follows:

"The plaintiff claimed title to the land through adverse possession of 10 years or more, under claim of ownership and color of paper title. The elements of such a title are: (1) Such possession as the land reasonably admits of; (2) openness and notoriety and exclusiveness of possession; (3) hostility toward everybody else in respect of the possession; (4) holding the possession under a claim of right or claim or color of title; and (5) continuity for the statutory period of 10 years. To the constitution of the first element,—such possession as the land reasonably admits of,—it is not necessary that land which is uninclosed and uncultivated should be inclosed and cultivated, merely because it was capable of inclosure and cultivation. The possession is gauged by the actual state of the land, and not with reference to its capability of being changed into another state which would reasonably admit of a different character of possession. *Openness and notoriety and exclusiveness of possession are shown by such acts in respect of the land in its condition at the time as comport with ownership,—such acts as would ordinarily be performed by the true owner in appropriating the land or its avails to his own use, and in preventing others from the use of it as far as reasonably practicable; and near akin to these are the acts evidencing the element of hostility toward all the world.* * * *

" * * * A possession, to be adverse, need not be so open, continuous, and notorious as necessarily to be seen and known by the owner if he should casually go upon the land." (Emphasis supplied.)

The exclusiveness of the possession of the complainants admits of no argument. As shown above, the record shows no act

of ownership or claim of ownership over this land in more than thirty years by any Nix.

As stated in Goodson v. Brothers, supra, openness, notoriety and exclusiveness are shown by acts which at the time, considering the state of the land, comport with ownership, viz., such acts as would ordinarily be exercised by an owner in appropriating the land to his own use and the exclusion of others. See Monteith v. Chapman, 260 Ala. 206, 69 So.2d 866; Kidd v. Browne, 200 Ala. 299, 76 So. 65; W. T. Smith Lumber Co. v. Cobb, 266 Ala. 146, 94 So.2d 763.

■ And all acts of a possessory nature committed by the adverse claimant are to be considered collectively rather than independently in determining the sufficiency of his possession. Chastang v. Chastang, 141 Ala. 451, 37 So. 799.

We entertain the view that the complainants and their immediate predecessors have done what any true owner of wild, cut-over, uncultivated land would do. They surveyed it. They posted it against trespassers. They sold and removed timber as it matured as saw logs, pulpwood, piling and ties. This action resulted in the construction and operation of logging roads and in the construction and operation of portable sawmills, the signs of which remained on the land, including foundation timbers, log ramps, slab pits, sawdust piles, chips and slabs. They assessed and paid taxes.

We have cases in Alabama to the effect that the occasional entry upon land for the purpose of cutting timber is not sufficient to establish title by adverse possession. Turnipseed v. Moseley, 248 Ala. 340, 27 So.2d 483, 170 A.L.R. 882, and cases cited. But in the case just cited we observed:

"* * * To substantiate such a claim, without color of title, there must have been such persistent and continuous cutting from a particular tract of land, to the exclusion of the owner, in such way as to advertise to the world that the party so doing is occupying the specific tract and claiming it as his own * * *"—248 Ala. 345, 27 So. 2d 486.

It seems to us that if any Nix had gone on the respondent land at any time during the past twenty-five years, he could not have escaped knowledge of the fact that others than the Nix heirs were in possession and claiming the land. There were the Chesnut signs to inform him. There were the surveyed and blazed lines, the Sykes sawmill operation, the tie cutting. Actually, it seems to us that according to the evidence it would have been difficult to go upon the land at any time during the eleven years preceding the filing of the bill when someone was not there actually cutting timber.

We entertain the view that, considering the nature and character of the land, the possessory acts of complainants and those under whom they claim as detailed above, and the absence of any acts of possession or claim of ownerhip by the Nix heirs or anyone else until after the expiration of the ten-year period, the complainants have shown title by adverse possession. McMillan v. Aiken, 205 Ala. 35, 88 So. 135; Aiken v. McMillan, 213 Ala. 494, 106 So. 150; Parrish v. Davis, 265 Ala. 522, 92 So. 2d 897; W. T. Smith Lumber Co. v. Cobb, 266 Ala. 146, 94 So.2d 763; Morris v. Yancey, Ala., 104 So.2d 553;[1] Odom v. Averett, 248 Ala. 289, 27 So.2d 479; Moorer v. Malone, 248 Ala. 76, 26 So.2d 558.

The appellants, the Nix heirs, assert that as to 160 acres of the respondent land, they are tenants in common with complainants and that they bore that relationship to Dr. Rudder, hence they contend that the possession of complainants and Dr. Rudder does not operate against them. This is an erroneous view. The grantees of the second Daniel Nix and their grantees have not

1. 267 Ala. 657.

entered into possession as tenants in common, but have entered as strangers under conveyances purporting to convey the entire interest in the property.

■ The principle of law controlling the case under these circumstances is found stated in Riggs v. Fuller, 54 Ala. 141, 146, where the court, speaking to an analogous situation, said:

"* * * The grantor was one of the heirs to whom the lands had descended. A sale and conveyance by him of the entire fee to a stranger, who takes possession claiming the exclusive title, operates a disseisin of the other heirs, and converts the possession of the stranger into an adverse possession, which, if continued the length of time prescribed by the statute of limitations, will bar the entry of the other heirs. * * *"

The holding of this court in the Riggs case, supra, has been followed in several cases. See Walker v. Crawford, 70 Ala. 567; Fielder v. Childs, 73 Ala. 567; Dew v. Garner, 207 Ala. 353, 92 So. 647, 27 A.L.R. 5; Weaver v. Blackmon, 212 Ala. 681, 103 So. 889; Moore v. Elliott, 217 Ala. 339, 116 So. 346; Elsheimer v. Parker Bank & Trust Co., 237 Ala. 24, 185 So. 385. Also see "Title by Adverse Possession," by the Honorable Shufford B. Smyer of the Birmingham Bar, 14 Alabama Lawyer, pp. 352, 358.

■ There is nothing in the situation with reference to the Chesnuts reserving half the minerals, or Dr. Rudder reserving half the minerals which he owned when he conveyed to the Morgans, which can give aid or comfort to the Nix heirs. There was no production of oil or gas on the respondent land at the time the bill was filed in so far as we can determine from this record. There was no physical possession of the minerals independent of the surface throughout the period that adverse possession was running in favor of the title of the complainants. Hence, the possession of the surface by the Morgans and by their predecessor, Dr. Rudder, and by his predecessor, the Chesnuts, inured to the benefit of the mineral title. Moore v. Empire Land Co., 181 Ala. 344, 61 So. 940; Alabama Fuel & Iron Co. v. Broadhead, 210 Ala. 545, 98 So. 789.

Since we are of the opinion that the decree of the trial court must be affirmed on the ground that complainants had acquired title of the respondent land by adverse possession for ten years, there is no occasion to treat the other grounds upon which complainants rely to sustain the decree.

This is a voluminous record containing more than fifteen hundred pages. It has been carefully considered.

The decree of the trial court is affirmed.

Affirmed.

SIMPSON, GOODWYN and MERRILL, JJ., concur.

