[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 762 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 763 
 On Application for Rehearing
The opinion of this court issued on June 28, 2002, is withdrawn, and the following is substituted therefor.
Ray Wadkins and other members of his family who share an interest in land filed an adverse-possession claim in 1998 against Clark Melton to determine the boundary line between Wadkins and Melton's coterminous lands. They also sought compensation for the costs of a fence Melton had removed, the survey costs incurred to relocate the fence line, and court costs. Melton answered and counterclaimed, seeking, among other things, damages for trespass and recovery of the property included in Wadkins's complaint.
Following an ore tenus proceeding and a personal viewing of the disputed land, the trial court determined that neither party had adversely possessed the disputed land and that the boundary line was set out in the deed. Wadkins appealed.
 "It is well established that when a trial court, after ore tenus proceedings, enters a judgment setting a boundary line between coterminous landowners, that judgment is presumed correct if it is supported by credible evidence. Valentine v. Ireland, 580 So.2d 581
(Ala. 1991). Further, the presumption of correctness that attaches to the findings of fact made by the trial court when it hears ore tenus testimony is particularly strong in adverse-possession cases. Lilly v. Palmer, 495 So.2d 522 (Ala. 1986). . . ."
Henderson v. Dunn, [Ms. 2991235, November 16, 2001] ___ So.2d ___, ___ (Ala.Civ.App. 2001). "[T]he presumption [of correctness] is further enhanced if the trial court personally views the property in dispute." *Page 764 Bell v. Jackson, 530 So.2d 42, 44 (Ala. 1988).
Wadkins argues that the trial court's judgment is unsupported by the evidence and that it misapplied the law to the undisputed facts. After a thorough review of the record and the applicable law, we conclude that Wadkins is correct. Although the trial court had the advantage of personally viewing the witnesses and the disputed property, there was no dispute as to the two controlling issues in the case, namely: where the fence was located and how long the fence had existed and how the disputed property had been used by Wadkins's family and its tenants for the 10-year period necessary for adverse possession. Therefore, we conclude that the trial court had no material advantage over this court, and its judgment is due to be reversed.
 "Alabama recognizes two types of adverse possession: (1) statutory adverse possession pursuant to § 6-5-200, Ala. Code 1975, and (2) adverse possession by prescription. Sparks v. Byrd, 562 So.2d 211 (Ala. 1990). Specifically,
 "`"Adverse possession by prescription requires actual, exclusive, open, notorious and hostile possession under a claim of right for a period of twenty years. See, Fitts v. Alexander, 277 Ala. 372, 170 So.2d 808 (1965). Statutory adverse possession requires the same elements, but the statute provides further that if the adverse possessor holds under color of title, has paid taxes for ten years, or derives his title by descent cast or devise from a possessor, he may acquire title in ten years, as opposed to the twenty years required for adverse possession by prescription. Code 1975, § 6-5-200. See, Long v. Ladd, 273 Ala. 410, 142 So.2d 660
(1962)."'"
 "562 So.2d at 214 (quoting Kerlin v. Tensaw Land Timber Co., 390 So.2d 616, 618 (Ala. 1980) (emphasis omitted [in Henderson])). Further, our Supreme Court has consistently held that boundary disputes between coterminous landowners are hybrid types of adverse possession subject to a unique set of requirements and a period of adverse possession of only 10 years, even if none of the three additional elements described in § 6-5-200 is present. E.g., Sashinger v. Wynn, 571 So.2d 1065 (Ala. 1990); Johnson v. Brewington, 435 So.2d 64 (Ala. 1983)."
Henderson, ___ So.2d at ___.
 Background
Melton's land is bordered on the east and south sides by Wadkins's land. It is undisputed that, for at least 10 years and probably for over 30 years, a wire-mesh fence running north and south existed on the east side of Melton's land. Melton's property was predominately timberland all the way to the wire-mesh fence. On the east side of the fence line, however, a portion of the property described in Melton's deed had been cleared and was being used by Wadkins. We shall refer to that property as "the eastern strip." Wadkins claimed that his family had adversely possessed the eastern strip to the wire-mesh fence. The ownership of land on the south side of Melton's property, which we shall refer to as "the southern strip," was also disputed. The Wadkinses claimed that they adversely possessed the southern strip to a tree line that they say forms the boundary between the property and Melton's.
The undisputed evidence showed that a portion of the property described in Melton's deed was timberland until about 1968, when it was cleared by one of Wadkins's tenants; since then the property has *Page 765 
been used by the Wadkins family or Wadkins's tenants for growing crops. The boundary-line dispute arose after George Jeffcoat, who was a tenant of Wadkins, removed a portion of the fence at the southeastern-most point of Melton's land to use an irrigation system he had installed. Melton asked to be compensated for the use of his lands for the irrigation system. Wadkins stated that Jeffcoat installed the "center pivot irrigation system" for use on the southern portion of Wadkins land after signing the last lease in 1997. He said that Jeffcoat had to remove the southeast portion of the fence because of the irrigation system.
At the southeast corner of Melton's land, the wire-mesh fence included a gate that Jeffcoat had removed when he installed the irrigation system. Melton stated that although the gate could have been closed, it was always left open. Melton admitted that, despite his contention that the gate was on his land, he did not complain to anyone when the gate was removed.
Wadkins argues that he presented clear and convincing evidence to support his family's claim that it had acquired title to both the eastern strip and the southern strip through adverse possession. "In an adverse-possession case, the party asserting a claim to the property through adverse possession must show by clear and convincing evidence that there was `actual, hostile, open, notorious, exclusive, and continuous' possession for the statutory period." Henderson, ___ So.2d at ___, quoting Grooms v. Mitchell, 426 So.2d 820, 822 (Ala. 1983). "[T]he burden of proof rests upon the party asserting adverse possession, and every presumption is in favor of the holder of legal title." Lee v. Brown, 482 So.2d 293, 295 (Ala. 1985). We will first determine whether the use of the disputed land was open, notorious, exclusive and continuous.
 Open, Notorious, Exclusive, and Continuous
Melton testified that he purchased the land in 1990 and that he did not obtain a survey before he purchased it. He said that he drove around the property with Fred Garner, who was a relative of Wadkins and whose heirs were coplaintiffs in this case. Melton, however, did not testify that Garner showed him where Garner thought the boundary line was located. None of the Wadkins family members, other than Wadkins, testified. Melton testified that after he purchased the property he removed the wire-mesh fence on the eastern strip because it was on his land. Melton had the land surveyed in 1993 and learned that the boundary line recited in the deed to his property was to the east of the wire-mesh fence. A note on the 1993 survey specifically stated that the property that we refer to in this opinion as "the eastern strip" was "claimed by others."
Tom Layton, who was called as a witness by Melton, testified that he had lived in the area where the disputed land was located for approximately 40 to 50 years, that he knew both Wadkins and Melton, and that he used to sharecrop with Wadkins's family. Layton said that, while he was working on the Wadkinses' land in 1974 or 1975, he constructed a fence of wire mesh with barbed-wire on top ("the second fence"). He said that he put the second fence "up against" the original wire-mesh fence, "right next to" the original fence it replaced. Neither party introduced any further evidence as to who erected the original fence or when it was erected.
Wadkins, who was born in 1952 and was, at the time of trial, the manager of his family's property, testified that his family purchased the property in 1954. He testified that, as far back as he could remember, there had always been a wire-mesh *Page 766 
fence on the eastern strip and the eastern strip had always been used either to grow crops or to pasture cattle. Wadkins recalled that when he was seven or eight years old, a tenant named Mr. Worthy had used the eastern strip to grow peanuts.
Wadkins stated that, after Melton removed the wire-mesh fence (including what remained of the original fence and the second fence erected in 1974), a tenant named Bill Shiver constructed a barbed-wire fence ("the third fence") in the mid-1990s and that it was located approximately 10 to 15 feet east of where the wire-mesh fence had stood. Wadkins said that, despite the new fence line, his family had continued to maintain that the boundary line was where the wire-mesh fence had stood. Melton eventually removed the barbed-wire fence. Melton admitted that both fences were constructed on what he believed to be his land. He also admitted that he did not remove the barbed-wire fence until after it had stood for "a couple of years."
Wadkins stated that the Laytons had farmed the land beginning in approximately 1970. Wadkins said that, as was the case with all the tenants, during Layton's time on the land the eastern strip was sometimes used as pasture land for cows all the way to the fence line. Wadkins stated that the tenants were responsible for maintaining the fence line. Wadkins said Bill Shiver was the tenant from about 1990 to 1994 and that Jeffcoat became the tenant of the land in approximately 1994 and was still farming the land. Jeffcoat testified that he was told that the land he was leasing extended to the wire-mesh fence line.
After thoroughly reviewing the record, we hold that the evidence was clear and convincing that Wadkins's use of the eastern strip was open, notorious, exclusive, and continuous. In Alabama, the existence of a fence, coupled with the pasturing of animals or the cultivation of land has been held to be sufficient evidence to support a finding that the possession was open and notorious. Lilly v. Palmer, 495 So.2d 522 (Ala. 1986). Each type of use need not be continuous. Id. "`To constitute an actual possession of land it is only necessary to put it to such use or exercise such dominion over it as in its present state it is reasonably adapted to.'" James v. Mizell, 289 Ala. 84, 88, 265 So.2d 866, 869 (Ala. 1972) (quoting Moorer v. Malone, 248 Ala. 76, 78, 26 So.2d 558, 559
(1946)). The fact that use of the eastern strip by Wadkins's tenants was visible from the county highway north of the property further supports Wadkins's claim that the use of the strip was open and notorious. Over the years, Wadkins's family had leased their land to several tenant farmers. "[T]he acts of a tenant inure to the benefit of his landlord where the landlord is an adverse possessor." Kerlin v. Tensaw Land Timber Co., 390 So.2d 616, 619 (Ala. 1980).
Melton concedes that the Wadkins family's use of the field road was open, but he contends that it was not exclusive. The only evidence indicating that someone other than a member of Wadkins's family or its tenants used the eastern strip was that Bill Shiver's brother, Eb, used a field road to the east of the wire-mesh fence line as a means of ingress to and egress from his landlocked property. The use of a field road to access landlocked property, however, is presumptively permissive. SeeCotton v. May, 293 Ala. 212, 301 So.2d 168 (1974). Wadkins testified that his family members also used the field road. There was no testimony as to any use of the field road by Melton's predecessors in title. We conclude that Wadkins presented clear and convincing evidence that his family's possession of the eastern strip was exclusive *Page 767 
and continuous for the required 10-year period.
We now turn to the issue whether Wadkins proved that his family's use of the eastern strip was hostile.
 Hostile
To prevail on his adverse-possession claim, Wadkins was required to present clear and convincing evidence to overcome the presumption that his family's use the eastern strip was permissive. The trial court's judgment did not include any finding of facts; therefore, we are required to assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous. Bearden v.Ellison, 560 So.2d 1042 (Ala. 1990).
"It is well settled that entry upon and possession of land with permission of the owner will not ripen into title by adverse possession."Wallace v. Putman, 495 So.2d 1072, 1076 (Ala. 1986).
 "In order to change possession from permissive to adverse, the possessor must make a clear and positive disclaimer or repudiation of the true owner's title. The possessor must give the true owner actual notice of such disavowal, or he must manifest acts or make a declaration of adverseness so notorious that actual notice will be presumed."
Moss v. Woodrow Reynolds Son Timber Co., 592 So.2d 1029, 1031 (Ala. 1992). "The presence of a fence, which is an outstanding symbol of possession, coupled with normal acts of use in appropriation of the land, sufficiently satisfies the requirements of adverse possession." Beardenv. Ellison, 560 So.2d 1042, 1045 (Ala. 1990). The trial court was authorized to conclude that a member of the Wadkins family or one of its tenants built the original wire-mesh fence before 1974. The evidence was undisputed that Wadkins's tenant Layton built the second fence in 1974. We conclude that Wadkins's building of the wire-mesh fences, in addition to his family's use of the land, was sufficient to show that his family's use of the disputed land was hostile. "`When one of the coterminous proprietors builds a fence as the dividing line and occupies and claims to it as such, with knowledge of the other, the claim of the former is presumptively hostile and the possession adverse.'" Garringer v.Wingard, 585 So.2d 898, 900 (Ala. 1991) (quoting Smith v. Brown,282 Ala. 528, 535, 213 So.2d 374, 380 (1968)).
When Layton erected the second fence, it took the place of the original fence that was deteriorating and in need of repair. There was no evidence indicting that Melton's predecessors in title objected to the construction of the second fence on their property. Wadkins testified that he had no knowledge of there ever having been a dispute with the previous owners of Melton's land over the property line. Melton's predecessor in title did not testify.
The same is true where an adverse landowner clears land beyond a survey line. "Cutting of timber, although it may not, standing alone be sufficient, is one factor to consider." Kubiszyn v. Bradley, 292 Ala. 570,575, 298 So.2d 9, 13 (1974). The southern strip had no fence line and had been cleared by Wadkins's tenant beyond the survey line. Wadkins had also built a deer stand on the southern strip in the "mid `80s." Melton admitted that the deer stand was on his property.
To prove adverse possession of the southern strip, Wadkins was not required to show that he purposely intended to take Melton's land. "If a coterminous landowner holds actual possession of a disputed strip under claim of right, openly and exclusively for a continuous period of 10 years, believing that he is holding to the true line, he will acquire title to that line, *Page 768 even though the belief as to the correct location of the line originatedin a mistake." Scarbrough v. Smith, 445 So.2d 553, 556 (Ala. 1984) (emphasis added). "[O]ne does not have to be a willful landgrabber or dishonest in order to acquire title by adverse possession." Sylvest v.Stowers, 276 Ala. 695, 699, 166 So.2d 423, 427 (1964).
We acknowledge that it is rare in boundary-line disputes for an appellate court to reverse a trial court's judgment. As stated in Lillyv. Palmer, 495 So.2d at 530:
 "We reiterate that it is a rare case when this Court will overturn a finding by a trial judge who hears an adverse possession case presented ore tenus, but this is one of those rare cases.
 "[The adverse claimant's] evidence was uncontradicted, and we hold that as a matter of law, [he] hostilely, openly, notoriously, actually, exclusively, and continuously possessed the property for the requisite statutory period of 10 years."
We remand this case to the trial court with instructions to render a judgment for Wadkins consistent with this opinion. The trial court is directed to determine the appropriate boundary-line coordinates for the southern boundary of Melton's land, which should be where the tree line is located. The original wire-mesh fence line shall be the east boundary line of Melton's land.
OPINION OF JUNE 28, 2002, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; REVERSED AND REMANDED.
Yates, P.J., and Thompson and Pittman, JJ., concur.